**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KEITH DIAL, Derivatively on Behalf of Nominal Defendant WHEELS UP EXPERIENCE INC., <br><br>               Plaintiff, <br><br>    v. <br><br> KENNETH DICHTER, TODD SMITH, DAVID ADELMAN, TIMOTHY ARMSTRONG, DWIGHT JAMES, GEORGE N. MATTSON, ADAM ZIRKIN, ALAIN BELLEMARE, ADAM CANTOR, ANDREW DAVIS, DAN JANKI, ZACHARY LAZAR, LEE MOAK, JEFF NEDELMAN, CHI CHEUNG, MARC FARRELL, ADMIRAL MIKE MULLEN, BRAD RADECKI, SUSAN SCHUMAN, ERIK SNELL, RAVI THAKRAN, and ERIC PHILLIPS, <br><br>               Defendants, <br><br>    and <br><br> WHEELS UP EXPERIENCE INC., <br><br>               Nominal Defendant. | Case No. |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

By and through his undersigned counsel, Plaintiff Keith Dial ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Wheels Up Experience Inc. ("Wheels Up" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of §10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duties; (iii) breach of fiduciary duty for insider trading; (iv) unjust enrichment; and (v) waste of corporate

1

assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Wheels Up and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Wheels Up's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *The Lee Goodman Trust v. Wheels Up Experience Inc., et al.*, Case No. 1:23-cv-2900 (E.D.N.Y.) (the "Related Securities Action"); and (f) review of other publicly-available information concerning Wheels Up and the Defendants.

## NATURE OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant Wheels Up against certain of the Company's current executive officers and directors aiming to rectify the Defendants' violations of the Exchange Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from November 9, 2022 to the present (the "Relevant Period").[1]

2.      Throughout the Relevant Period, the Company failed to disclose that: (i) Wheels Up failed to address any material weaknesses with internal controls; (ii) Wheels Up's financial statements from September 30, 2022 to the present included "certain errors" such as understating net loss and overstating goodwill; (iii) as a result, Wheels Up would need to restate its previously

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from November 9, 2022 to the March 31, 2023; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

filed financial statements for certain periods; and (iv) as a result, the Company's statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

3.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Wheels Up's securities, Plaintiff and the Company have suffered significant losses and damages.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

5.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## THE PARTIES

7.      Plaintiff has been a shareholder since prior to the Relevant Period and has continuously held shares of Wheels Up common stock to present.

8.      Nominal Defendant Wheels Up is incorporated in Delaware and its current principal executive offices are located at 601 West 26th Street, Suite 900, New York, New York 10001. The Company's common stock trades on the NYSE under the ticker symbol "UP."

9.      Defendant Kenneth Dichter ("Dichter") founded Wheels Up in 2013 and served as

the Company's Chief Executive Officer ("CEO") and Chairman of the Board from its founding in 2013 until May 2023. Defendant Dichter then solely served as a director from May 2023 until his departure from the Company in September 2023. For the fiscal year of 2022, Defendant Dichter received $8,650,754 in total compensation. Defendant Dichter is named as a defendant in the Related Securities Action.

10.     Defendant Todd Smith ("Smith") has served as the Company's Chief Financial Officer ("CFO") since June 2022. For the fiscal year of 2022, Defendant Smith received $4,770,216 in total compensation. Defendant Smith is named as a defendant in the Related Securities Action.

11.     Defendants Dichter and Smith are collectively referred to herein as the "Securities Action Defendants."

12.     Defendant David Adelman ("Adelman") has served as a Company director since October 2013. Defendant Adelman is a member of the Compensation Committee. For the fiscal year of 2022, Defendant Adelman received $327,731 received in total compensation.

13.     Defendant Timothy Armstrong ("Armstrong") has served as a Company director since April 2019. Defendant Armstrong is a member of the Audit Committee and Nominating and ESG Committee. For the fiscal year of 2022, Defendant Armstrong received $265,178 in total compensation.

14.     Defendant Dwight James ("James") has served as a Company director since February 2022. Defendant James was appointed by Delta. His primary occupation, for Delta, is Senior Vice President—Customer Engagement and Loyalty. Defendant James is a member of the Safety and Security Committee.

16.     Defendant George N. Mattson ("Mattson") has served as the Company's CEO and

director since September 2023.

17.     Defendant Adam Zirkin ("Zirkin") has served as Chairman of the Board since September 2023.

18.     Defendant Alain Bellemare ("Bellemare") has served as a Company director since September 2023.

19.     Defendant Adam Cantor ("Cantor") has served as a Company director since September 2023.

20.     Defendant Andrew Davis ("Davis") has served as a Company director since September 2023.

21.     Defendant Dan Janki ("Janki") has served as a Company director since August 2023.

22.     Defendant Zachary Lazar ("Lazar") has served as a Company director since September 2023.

23.     Defendant Lee Moak ("Moak") has served as a Company director since September 2023.

24.     Defendant Jeff Nedelman ("Nedelman") has served as a Company director since September 2023.

25.     Defendant Chi Cheung ("Cheung") served as a member of the Board from 2016 until September 20, 2023.

26.     Defendant Marc Farrell ("Farrell") served as a member of the Board from 2021 until September 30, 2023.

27.     Defendant Admiral Mike Mullen ("Mullen") served as a member of the Board from 2021 until September 30, 2023.

28.     Defendant Brad Radecki ("Radecki") served as a member of the Board from 2017 until September 20, 2023.

29.     Defendant Susan Schuman ("Schuman") served as a member of the Board from 2021 until September 20, 2023.

30.     Defendant Erik Snell ("Snell") served as a member of the Board from November 2020 until September 26, 2023.

31.     Defendant Ravi Thakran ("Thakran") served as a member of the Board from 2021 until September 20, 2023 and as Chairman of the Board between May 9, 2023 and September 20, 2023.

32.     Defendant Eric Phillips ("Phillips") served as a member of the Board from July 2021 until February 2022.

33.     Defendants Dichter, Smith, Adelman, Armstrong, James, Mattson, Zirkin, Bellemare, Cantor, Davis, Janki, Lazar, Moak, Nedelman, Cheung, Farrell, Mullen, Radecki, Schuman, Snell, and Thakran are collectively referred to herein as the Director Defendants.

34.     The Director Defendants, along with the Securities Action Defendants are referred to herein collectively as the "Individual Defendants."

35.     Defendant Wheels Up, along with the Individual Defendants, are referred to herein collectively as the "Defendants."

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers, directors, and/or fiduciaries of Wheels Up, and because of their ability to control the business and corporate affairs of Wheels Up, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to

control and manage Wheels Up in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Wheels Up and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

37.     Each director and officer of the Company owes to Wheels Up and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

38.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

39.     Pursuant to the Audit Committee Charter[2] of Wheels Up, the purpose of the Audit Committee is to:

assist the Board in its oversight of:

- the adequacy and integrity of the Company's accounting and financial reporting processes and procedures;
- the integrity of the Company's financial statements;
- the Company's compliance with legal and regulatory requirements and the Company's enterprise risk management program;
- the independent auditor's appointment, qualifications, independence, work and retention;
- the scope, approach, performance and results of the independent auditors and the Company's internal audit function; and,
- to prepare the Committee's report required by the SEC to be included in the Company's annual proxy statement.

---

[2]Available      at      https://s27.q4cdn.com/682800059/files/doc_downloads/governance/Audit-Committee-Charter-US.pdf.

40.     Specifically, the Audit Committee has the following powers and responsibilities, among others:

**IV. Powers and Responsibilities**

<u>*Interaction with the Independent Auditor*</u>

1. *Appointment and Oversight*. The Committee shall be directly responsible for the appointment, compensation, retention, and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor shall report directly to the Committee.

2. *Pre-Approval of Services*. Before the independent auditor is engaged by the Company or its subsidiaries to render audit, audit-related, tax or non-audit services, the Committee shall pre-approve the engagement. Committee pre-approval of audit, audit-related, tax and non-audit services will not be required if the engagement for the services is entered into pursuant to pre-approval policies and procedures established by the Committee regarding the Company's engagement of the independent auditor, provided the policies and procedures are detailed as to the particular service, the Committee is informed of each service provided and such policies and procedures do not include delegation of the Committee's responsibilities under the Exchange Act to the Company's management. The Committee may delegate to one or more designated members of the Committee the authority to grant pre-approvals, provided such approvals are presented to the Committee at a subsequent meeting. If the Committee elects to establish pre-approval policies and procedures regarding non-audit services, the Committee must be informed of each non-audit service provided by the independent auditor. Committee pre-approval of non-audit services (other than review and attest services) also will not be required if such services fall within available exceptions established by the SEC for publicly listed companies.

3. *Independence of Independent Auditor*. The Committee shall, at least annually, review the independence and quality control procedures of the independent auditor and the experience and qualifications of the independent auditor's senior personnel that are providing audit services to the Company. In conducting its review:

    (i)   The Committee shall ensure that the independent auditor prepare and deliver, at least annually, a written statement delineating all relationships between the independent auditor and the Company, consistent with Independence Standards Board Standard.

    (ii)   The Committee shall actively engage in a dialogue with the independent

auditor with respect to any disclosed relationships or services that, in the view of the Committee, may impact the objectivity and independence of the independent auditor. If the Committee determines that further inquiry is advisable, the Committee shall take appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence.

(iii)   The Committee shall confirm with the independent auditor that the independent auditor is in compliance with the partner rotation requirements established by the SEC for publicly listed companies.

(iv)   The Committee shall, if applicable, consider whether the independent auditor's provision of any permitted information technology services or other non-audit services to the Company is compatible with maintaining the independence of the independent auditor.

_Annual Financial Statements and Annual Audit_

4. *Meetings with Management, the Internal Auditor, and the Independent Auditor*.

(i)   The Committee shall meet with management, the internal auditor (if any) and the independent auditor in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit.

(ii)   The Committee shall review and discuss with management and the independent auditor any material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities of which the Committee is made aware that do not appear on the financial statements of the Company and that may have a material current or future effect on the Company's financial condition, results of operations, liquidity, capital expenditures, capital resources or significant components of revenues or expenses.

(iii)   The Committee shall review and discuss the annual audited financial statements with management and the independent auditor.

(iv)   The Committee shall review and discuss the Company's financial reporting processes (both internal and external) with the independent auditor and the internal auditor.

5. *Separate Meetings with the Independent Auditor*.

(i)   The Committee shall review with the independent auditor any problems or difficulties the independent auditor may have encountered during the course of the audit work, including any restrictions on the scope of activities or access to required information or any significant disagreements with management and management's responses to such matters. Among the items that the Committee should consider reviewing with the Independent Auditor are: (A) any accounting adjustments that

were noted or proposed by the auditor but were "passed" (as immaterial or otherwise); (B) any communications between the audit team and the independent auditor's national office respecting auditing or accounting issues presented by the engagement; and (C) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor to the Company. The Committee shall obtain from the independent auditor assurances that Section 10A(b) of the Exchange Act has not been implicated.

(ii)  The Committee shall discuss with the independent auditor the report that such auditor is required to make to the Committee regarding: (A) all accounting policies and practices to be used that the independent auditor identifies as critical; (B) all alternative treatments within GAAP for policies and practices related to material items that have been discussed among management and the independent auditor, including the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (C) all other material written communications between the independent auditor and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent auditor's engagement letter, independent auditor's independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any.

(iii)  The Committee shall discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61, "Communication with Audit Committees," as then in effect and any other matters required to be communicated by the independent auditor under the standards of the Public Company Accounting Oversight Board ("**PCAOB**") and the rules and regulations of the SEC.

6. *Recommendation to Include Financial Statements in the Annual Report*. The Committee shall, based on the review and discussions in paragraphs 4(iii) and 5(iii) above, and based on disclosure received from the independent auditor regarding its independence and discussions with the auditor regarding such independence pursuant to subparagraph 3(i) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

<u>Quarterly Financial Statements</u>

7. *Meetings with Management, the Independent Auditor, and the internal Auditor*. The Committee shall review and discuss the quarterly financial statements with management, the internal auditor (if any) and the independent auditor.

<u>Other Powers and Responsibilities</u>

8. The Committee shall discuss with management and the independent auditor the Company's earnings press release (with particular focus on any "pro forma" or "adjusted" non- GAAP financial information), as well as financial information and earnings guidance provided to analysts and ratings agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

9. The Committee shall review and approve all related-party transactions that would be required to be disclosed under Items 404(a) and 404(b) of SEC Regulation S-K and to the extent otherwise material.

10. In addition to its review of the Company's annual and quarterly financial statements, the Committee shall review and discuss any relevant financial reports or other financial information submitted by the Company to any governmental body or the public, including earnings press releases and/or guidance, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP financial information. Such discussions may be in general terms.

11. The Committee shall approve the appointment, replacement, reassignment, and dismissal of the Company's Chief Financial Officer.

12. The Committee shall discuss with management and the independent auditor any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies[,] or internal audit function.

13. The Committee shall discuss with management policies with respect to risk assessment and risk management, including appropriate guidelines and policies to govern the process, as well as the Company's major financial risk exposures and the steps management has undertaken to control them.

14. The Committee shall set policies, consistent with governing laws and regulations, for hiring personnel of the independent auditor.

15. The Committee shall discuss with the Company's General Counsel or outside counsel any significant legal, compliance or regulatory matters that could reasonably be expected to have a material impact on the Company's financial statements or compliance policies, including violations of the Company's Code of Business Conduct and Ethics.

16. The Committee shall request assurances from management, the independent auditor and the Company's internal auditor (if any) that the Company's foreign

subsidiaries and foreign affiliated entities, if any, are in conformity with applicable legal requirements, including disclosure of affiliated party transactions.

17. The Committee shall discuss any disclosures made to the Committee by the Company's Chief Executive Officer or Chief Financial Officer during their certification process for the Form 10-K and the Form 10-Q regarding: (i) any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and any material weakness in internal controls identified to the independent auditor; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

18. If reported to the Committee by any attorney employed by or performing legal services for the Company, the Committee shall consider any evidence of a material violation of securities law or breach of fiduciary duty or similar violation by the Company or any agent of the Company.

19. The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls, or auditing matters. The Committee shall also establish procedures for the confidential and anonymous submission by employees regarding questionable accounting or auditing matters.

20. The Committee shall provide the Company with the report of the Committee with respect to the audited financial statements required by Item 306 of SEC Regulation S-K for inclusion in each of the Company's annual proxy statements.

21. The Committee shall review the responsibilities, plan, budget and staffing of the Company's internal audit function and the appointment and replacement of the head of the internal audit department. Additionally, the Committee will review with management the progress and results of internal audit projects.

22. The Committee, through its Chair, shall report regularly to the Board, and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to the Board.

41.     Lastly, the Audit Committee is required to "at least annually perform an evaluation (which need not be in writing) of the performance of the Committee and its members, including a review of the Committee's compliance with this Charter."

42.     Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Wheels Up's Code of Business Conduct and Ethics**

43.     The "Code of Business Conduct and Ethics" (the "Code")[3] of Wheels Up, begins with an introduction which states that:

> Wheels Up Experience Inc. and its subsidiaries (collectively, "Wheels Up," the "Company," "we," "us," or "our") strive to conduct their business according to the highest ethical standards and integrity. We expect our officers, directors, employees and contractors to conduct themselves and their business activities in accordance with these standards. Corporate officers (including the Company's principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions), directors, employees and contractors (together or referred to in this Code, collectively or individually, as "Personnel") must act lawfully, ethically and honestly in all dealings with Wheels Up's members, clients, vendors, suppliers and others who provide services to or transact business with Wheels Up ("Business Partners"). The integrity of our reputation and brand and the experience we provide our members and clients depends on your exercise of good judgment in all that you do. Unethical, dishonest, or inappropriate conduct will not be tolerated.

44.     Regarding conflicts of interest, the Code states that:

> Wheels Up's business dealings must never be influenced by, or appear to be influenced by, its Personnel's personal interests. Therefore, upon hire, each year, and whenever a potential conflict of interest arises, employees are required to disclose all interests, relationships[,] or activities which may present a conflict of interest between Wheels Up and the Personnel.

> A conflict of interest may exist and should be disclosed where these interests, relationships or activities may directly or indirectly compete or interfere with the business, business opportunities or business relationships (including vendor, supplier, member, client, and employee relationships) of Wheels Up. Conflicts of interest may arise when any Personnel or a member of her or his family or friends receives improper personal benefits as a result of her or his position with Wheels Up. Loans to, or guarantees of obligations of any Personnel and their family

---

[3] Available at https://s27.q4cdn.com/682800059/files/doc_downloads/governance/2023/02/ Wheels-Up-Code-of-Business-Conduct-and-Ethics-(Effective-February-16-2023).pdf.

members or friends are generally not permitted due to legal concerns and because they may create conflicts of interest.

Identifying potential conflicts of interest may not always be clear cut. For example, on an indicative and non-exclusive basis only, it is a conflict of interest for Personnel to:

- Have any financial interest (other than nominal stock interests in publicly-held corporations) in any competitor, or Business Partner of Wheels Up.
- Work for, be associated with or provide any services or materials to any competitor, or Business Partner of Wheels Up, without written permission from Wheels Up's Human Resources or Legal Department.
- Solicit any gifts, money, services or anything else of value from any competitor or Business Partner of Wheels Up.
- Accept anything (including, without limitation, gifts, money or services) of any value from any competitor of Wheels Up.
- Accept anything (including, without limitation, gifts, money or services) of more than nominal value from any member, potential member, client, supplier or vendor of Wheels Up (subject to limited exceptions described in the Favors and Gifts section below).
- Engage in any outside employment, independent consulting or volunteer activity which may interfere or conflict with the employee's duties and responsibilities to Wheels Up.
- Use the Wheels Up name for any outside activities including sponsorship of athletic teams, support for charitable organizations and/or conducting business with outside entities.
- Serve as an officer or director of or receive any compensation from an outside organization that is not a professional, social, religious, educational, civic or charitable organization.

The actions of family members or friends outside the workplace may also give rise to the conflicts of interest described above, because they may influence Personnel's objectivity in making decisions on behalf of Wheels Up. For purposes of this Code, "family members" includes, without limitation, your spouse, brothers, sisters, parents, in-laws and children whether such relationships are by blood or adoption.

This policy does not preclude Personnel from socializing with members, clients, competitors, suppliers and vendors, however, Personnel must not violate any of the provisions of this Code in connection with such socializing. Personnel also must be careful to avoid even the appearance of a conflict of interest.

While Personnel are encouraged to create and foster a friendly workplace, romantic or other intimate relationships in the workplace may give rise to a conflict of interest and must comply with the guidelines set forth in the employee handbook or policy applicable to you.

Questions and potential conflicts issues should be brought to the attention of your manager, the Human Resources Department and/or the Legal Department. These items will be presented to the Legal Department and/or Board of Directors, who shall determine whether a conflict of interest exists. Unless the Legal Department or the Board of Directors, in their sole discretion, waives the conflict of interest, it shall be a condition of employment that no employee has a conflict of interest with Wheels Up. Employees who violate this policy will be subject to discipline, up to and including termination, in accordance with applicable laws and collective bargaining agreements (if any). For additional detail on this topic, please refer to the employee handbook or policy applicable to you.

45.     Regarding corporate opportunities, the Code states that:

Every Personnel has a duty to Wheels Up to advance Wheels Up's legitimate interest and shall not compete with Wheels Up in any way. Wheels Up's property or information or your position within Wheels Up should not be used for your own personal gain. You may not take personal advantage of opportunities that are presented to you or discovered by you through your use of Wheels Up's property or information or as a result of your position within Wheels Up.

46.     Regarding insider trading, the Code states that:

During the course of your relationship with Wheels Up, you may receive or become privy to material, nonpublic information about Wheels Up, or its Business Partners. Material information includes information that could be important for an investor to consider in making a decision about whether to buy or sell securities. Federal, state or local securities law prohibits you from using such material, nonpublic information to purchase, sell, gift or otherwise trade in the Company's securities or provide any such information to others outside of Wheels Up. The penalties for trading on material, nonpublic information can be severe, both for individuals involved in such unlawful conduct and their employers and supervisors, and may include jail terms, criminal fines, civil penalties[,] and civil enforcement injunctions. Our Insider Trading Policy has important information and details regarding these restrictions on trading, including information on related company-wide trading windows and blackout periods.

47.     Regarding compliance with laws, the Code states that: "It is your duty to comply fully with all applicable laws, rules and regulations in cities, states, and countries in which Wheels Up operates."

48.     Regarding records, financial and tax integrity, the Code states that:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings releases, financial reports and disclosures to our shareholders and

lenders, and guide our business decision-making and strategic planning. Wheels Up records include sales information, payroll, travel and expense reports, e-mails, accounting, tax and financial data, measurement and performance records, electronic data files and all other records maintained in the ordinary course of our business. All Wheels Up records must be complete, accurate and reliable in all material respects. Wheels Up policy is to comply with utmost best practice in maintaining complete and accurate financial books, financial and tax records and statements related to its business in accordance with applicable laws, regulations and recognized industry practices. Wheels Up ensures transparency in all its financial and tax dealings and has adequate internal controls in place. Undisclosed or unrecorded funds, payments[,] or receipts are inconsistent with our business practices and are prohibited. You are responsible for understanding and complying with our record keeping policy and to report to your manager, the Legal Department[,] or through the Whistleblower policy[,] any breach or suspected breach of this policy that you may become aware of. Ask your manager if you have any questions.

49.     Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

## Control, Access, and Authority

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wheels Up, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Wheels Up.

51.     Because of their advisory, executive, managerial, and directorial positions with Wheels Up, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Wheels Up.

52.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wheels Up and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

53.     To discharge their duties, the officers and directors of Wheels Up were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Wheels Up were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Wheels Up conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Wheels Up was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

54.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Wheels Up and its shareholders the fiduciary duties of loyalty and good faith, and the

exercise of due care and diligence in the management and administration of the affairs of Wheels Up, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Wheels Up, the absence of good faith on their part, and a reckless disregard for their duties to Wheels Up and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Wheels Up.

55.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

56.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Wheels Up has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

57.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively

and individually took the actions set forth herein.

59.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Relevant Period

62.     On November 9, 2022, after market hours, the Company issued a press release announcing its unaudited third quarter financial results, which ended September 30, 2022, on Form 8-K. The unaudited third quarter financial results revealed the Company reported a net loss of $86,838,000 three months ended September 30, 2022 and $268,637,000 nine months ended

September 30, 2022. The Company also reported goodwill of $521,847,000 and accumulated deficit of $988,964,000 ended September 30, 2022.

63.     That same day, the Company filed with the SEC its third quarter report on Form 10-Q for the quarter ended September 30, 2022 (the "3Q22 Report"). Attached to the 3Q22 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Dichter and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

64.     The 3Q22 Report revealed substantively the same numbers as referenced above regarding the Company's net loss, goodwill, and accumulated deficit.

65.     The 3Q22 Report failed to identify any material weaknesses regarding the Company's internal controls by stating the following, in relevant part:

### ITEM 4. CONTROLS AND PROCEDURES

#### Evaluation of Disclosure Controls and Procedures

As required by Rule 13a-15(b) under the Exchange Act, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report. Based upon that evaluation, *our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures are effective at a reasonable assurance level.*

#### Changes in Internal Control over Financial Reporting

*[T]here were no changes in our internal control over financial reporting during the quarter ended September 30, 2022, which were identified in connection with management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*[4]

66.     On March 9, 2023, before market hours, the Company issued a press release

---

[4] All emphasis is added unless otherwise noted.

announcing its unaudited fourth quarter financial results, which ended December 31, 2022, on Form 8-K. The unaudited fourth quarter financial results revealed the Company reported a net loss of $238,910,000 three months ended December 31, 2022 and $507,547,000 twelve months ended December 31, 2022. The Company also reported goodwill of $396,118,000 and impairment of goodwill of $132,000,000 ended December 31, 2022.

67.     The statements contained above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Wheels Up failed to address any material weaknesses with internal controls; (2) Wheels Up's financial statements from September 30, 2022 to the present included "certain errors" such as understating net loss and overstating goodwill; (3) as a result, Wheels Up would need to restate its previously filed financial statements for certain periods; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

68.     Then on March 17, 2023, after market hours, the Company issued a Notification of Late Filing on Form 12b-25 regarding the Company's inability to time file its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). The late filing form stated the following, in relevant part:

> *The Company experienced unanticipated delays in compiling certain necessary information to complete its audited financial statements and prepare a complete filing of its Annual Report in a timely manner without unreasonable effort or expense.*

The Company anticipates that the Annual Report will be filed as soon as practicable

and prior to the fifteenth calendar day following the prescribed due date.

69.     On this news, Wheels Up's share price fell $0.027 per share, or 3.28%, to close at $0.7970 per share on March 20, 2023, the next trading day.

70.     Then on March 31, 2023, after market hours, the Company filed an 8-K/A with the SEC announcing it would restate its financial statements from September 30, 2022 to the present, and expected to report at least one material weakness. The 8-K/A states in relevant part:

**Item 2.02 Results of Operations and Financial Condition.**

The Company is filing this Amendment No. 1 to the Original Filings to reflect adjustments to the presentation of the Company's unaudited financial statements and reconciliations of Net loss to Adjusted EBITDA, in each case contained in the Original 3Q Press Release and the Original 4Q Press Release and incorporated by reference into the Original 3Q Filing and the Original 4Q Filing, respectively. ***In connection with the preparation of the audited financial statements to be included in the Annual Report on Form 10-K, the Company determined that noncash goodwill impairment charges of (i) $62.0 million should have been recognized by the Company during the three months ended September 30, 2022, based on the Company's reassessment of the fair value of the legacy Wheels Up reporting unit (excluding Air Partner) ("WUP Legacy") as of September 30, 2022, and (ii) $118.0 million should have been recognized by the Company during the three months ended December 31, 2022 [and $180 million for the twelve months ended December 31, 2022], based on the assessment of the fair value of WUP Legacy as of December 31, 2022, in each case that were necessary to reflect the diminished fair value of WUP Legacy as of the applicable measurement dates.***

The recognition of non-cash goodwill impairment charges of $62.0 million for the three months ended September 30, 2022 and $118.0 million for the three months ended December 31, 2022 resulted in the following changes to the Company's unaudited condensed consolidated financial statements set forth in the Original Press Releases:

- For the three and nine months ended September 30, 2022, the Company recognized a charge for "Impairment of goodwill" of $62.0 million in the Company's unaudited condensed consolidated statements of operations, which resulted in:

  o a $62.0 million increase to the Company's Net loss for the three and nine months ended September 30, 2022 versus the previously reported financial results;

     o  a revised Net loss of $148.8 million, or $0.61 per share, for the three months ended September 30, 2022, and $330.6 million, or $1.35 per share, for the nine months ended September 30, 2022; and

     o  corresponding adjustments, and associated impacts of the adjustments, to:

          ▪  the balances of the "Goodwill" [of $459,847,000] and "Accumulated deficit" [of $1,050,964,000] line items in the Company's unaudited condensed consolidated balance sheets as of September 30, 2022;

          ▪  the balances of "Net loss" and "Impairment of goodwill" in the Company's unaudited condensed consolidated statements of cash flows for the nine months ended September 30, 2022; and

          ▪  the balances of "Net loss" and "Impairment of goodwill" and the "Impairment of goodwill" reconciling item in the Company's reconciliations of Net loss to Adjusted EBITDA for the three and nine months ended September 30, 2022.

- For the three months ended December 31, 2022, the Company decreased the charge for "Impairment of goodwill" by $14.0 million in the Company's unaudited condensed consolidated statements of operations versus what was reported in the Original 4Q Press Release, which resulted in:

     o  a $14.0 million decrease to the Company's Net loss for the three months ended December 31, 2022 and, taking into account the impact of the non-cash goodwill impairment charge for the three months ended September 30, 2022, a $48 million increase to the Company's Net loss for the year ended December 31, 2022, in each case versus the previously reported financial results;

     o  a revised Net loss of $224.9 million, or $0.91 per share, for the three months ended December 31, 2022, and $555.5 million, or $2.26 per share, for the year ended December 31, 2022; and

     o  corresponding adjustments, and associated impacts of the adjustments, to the following items, in each case in the same manner described with respect to the "Impairment of goodwill" charge recognized during the three and nine months ended September 30, 2022 above:

- ▪ the Company's unaudited condensed consolidated balance sheets as of December 31, 2022;

- ▪ the unaudited condensed consolidated statements of cash flows for the year ended December 31, 2022; and

- ▪ the reconciliations of Net loss to Adjusted EBITDA for the three months and year ended December 31, 2022.

- The adjustments did not impact the Company's Adjusted EBITDA results for the three and nine months ended September 30, 2022 or the three months and year ended December 31, 2022.

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(a) On March 27, 2023, the Company, on the recommendation of the Audit Committee of the Company's Board of Directors, *concluded that the Prior Financial Statements should no longer be relied upon. This determination resulted from the identification of an error in the Prior Financial Statements, which resulted in a non-cash goodwill impairment charge related to WUP Legacy for the three months ended September 30, 2022 that is described in Item 2.02 of this Amendment No. 1.*

(b) *The Company has assessed the materiality of this error in accordance with applicable SEC rules, and has concluded that the Prior Financial Statements should be restated.* The Company intends to include the restated Prior Financial Statements in an amended Quarterly Report on Form 10-Q/A (the "Amended Quarterly Report") to be imminently filed with the SEC. As a result of the restatement of the Prior Financial Statements and the Amended Quarterly Report, *management has determined that a material weakness existed in the Company's internal control over financial reporting related to the financial statement close process for the three months ended September 30, 2022.*

71.     That same day, the Company filed with the SEC a restatement on Form 10-Q/A for the 3Q22 Report. Attached to the Amended Quarterly Report were SOX certifications signed by Defendants Dichter and Smith attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The Amended Quarterly Report revealed the Company reported substantively the same numbers as referenced above regarding the Company's net loss, goodwill, impairment of

goodwill, and accumulated deficit.

72.     The Amended Quarterly Report revealed material weaknesses regarding the

Company's internal controls by stating the following, in relevant part:

### ITEM 4. CONTROLS AND PROCEDURES

***Evaluation of Disclosure Controls and Procedures***
As required by Rule 13a-15(b) under the Exchange Act, our management, including
our Chief Executive Officer and Chief Financial Officer, evaluated the
effectiveness of our disclosure controls and procedures as of the end of the period
covered by this Form 10-Q/A.

***At the time of the Original 10-Q Filing, management, including our Chief
Executive Officer and Chief Financial Officer, initially concluded that our
disclosure controls and procedures were effective as of September 30, 2022. As a
result of the restatement of the Company's financial statements and the material
weakness identified below, management has reconsidered its assessment and now
concludes that we did not maintain effective disclosure controls and procedures.***

***Management's Report on Internal Control over Financial Reporting***

***In connection with the preparation of the audited financial statements to be
included in the Annual Report on Form 10-K, management identified a material
weakness in certain internal controls over financial reporting related to the
financial statement close process. The deficiency resulted in a restatement of the
Company's unaudited condensed consolidated financial statements as of and for
the three and nine months ended September 30, 2022 to recognize a non-cash
goodwill impairment charge which should have been recognized during the three
months ended September 30, 2022, which resulted in the understatement of Net
loss for the three and nine months ended September 30, 2022.*** The Company filed
a Quarterly Report on Form 10-Q/A with the SEC on March 31, 2023 to restate the
unaudited condensed consolidated financial statements as of and for the three and
nine months ended September 30, 2022. The Company's remediation plan will be
described in the Company's Annual Report on Form 10-K for the year ended
December 31, 2022.

73.     That same day, the Company issued filed with the SEC its 2022 Annual Report on

Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the

2022 Annual Report were SOX certifications signed by Defendants Dichter and Smith attesting to

the accuracy of financial reporting, the disclosure of any material changes to the Company's

internal control over financial reporting and the disclosure of all fraud. The 2022 Annual Report revealed the Company reported substantively the same numbers as referenced above regarding the Company's net loss, and impairment of goodwill.

74.    The 2022 Annual Report revealed material weaknesses regarding the Company's internal controls by stating the following, in relevant part:

### ITEM 9A. CONTROLS AND PROCEDURES

*Evaluation of Disclosure Controls and Procedures*

*As required by Rule 13a-15(b) under the Exchange Act, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the period covered by this Annual Report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of December 31, 2022 due to material weaknesses in our internal control over financial reporting described below*. In light of this fact, our management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weaknesses in our internal control over financial reporting, the consolidated financial statements for the periods covered by and included in this Annual Report fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with generally accepted accounting principles in the United States of America ("GAAP").

*Management's Annual Report on Internal Control over Financial Reporting*

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2022 based on the criteria described in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). *Based on this assessment, management, including the Company's Chief Executive Officer and Chief Financial Officer, concluded that our internal control over financial reporting was not effective as of December 31, 2022 due to control deficiencies that, when aggregated, resulted in the material weaknesses described below, which are defined as a deficiency, or a combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.*

*We did not maintain effective controls over information technology ("IT") for IT*

*systems and applications that are relevant to the preparation of the consolidated financial statements. Specifically, we identified deficiencies in (i) user access controls to ensure appropriate segregation of duties, (ii) controls that restrict user access to financial applications, programs and data affecting underlying accounting records, and (iii) program change management controls affecting IT applications and underlying accounting records, that ensure IT program and data changes are identified, tested, authorized and implemented properly.* None of the IT deficiencies resulted in a material misstatement to our annual or interim consolidated financial statements for the year ended December 31, 2022.

*We did not maintain effective controls over the financial statement close and key business processes. Specifically, we did not consistently execute on our established accounting policies and procedures, and did not design, document and maintain controls to achieve complete, accurate and timely financial accounting, reporting and disclosures in accordance with GAAP. These include controls over account reconciliations, segregation of duties, review of journal entries and review of complex accounting matters. This deficiency resulted in a restatement of our unaudited condensed consolidated financial statements for the quarter and year-to-date period ended September 30, 2022.*

75.     On this news, Wheels Up's share price fell $0.072 per share, or 11.37%, to close at $0.5610 per share on April 3, 2023, the next trading day, damaging investors.

76.     As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, the Company and its shareholders have been damaged.

## DEFENDANTS' INSIDER TRADING

77.     Certain of the Individual Defendants capitalized on the artificially inflated stock price by selling significant portions of their holdings of Company common stock. While in possession of material, adverse, non-public information, Defendant Smith (the "Insider Selling Defendant") collectively sold tens of thousands of shares of Wheels Up stock for proceeds of nearly $284,444. The sale made by the Insider Selling Defendant during the Relevant Period was suspiciously large in quantity and timing and was inconsistent with their pre- and post-Relevant Period trading practices.

78.     Defendant Smith sold 273,504 shares of his personally held Wheels Up stock for proceeds of $284,444 on January 3, 2023.

## DAMAGES TO THE COMPANY

79.     Wheels Up has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Wheels Up has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

      a.    costs incurred in compensation and benefits paid to Defendants that breached their fiduciary duties and violated federal securities laws;

      b.    substantial loss of market capital;

      c.    costs already incurred and to be incurred defending the Related Securities Action and;

      d.    any fines or other liability resulting from the Company's violations of federal law.

80.     In addition, Wheels Up's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

81.     The wrongdoing complained of herein has irreparably damaged Wheels Up's corporate image and goodwill.  For at least the foreseeable future, Wheels Up will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Wheels Up's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.     Plaintiff brings this action derivatively in the right and for the benefit of Wheels Up

to redress injuries suffered, and to be suffered, by Wheels Up as a direct result of violations of federal securities laws by the Defendants. Wheels Up is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

83.     The Board of Wheels Up, at the time this action was commenced, consisted of Defendants Adelman, Armstrong, James, Mattson, Zirkin, Bellemare, Cantor, Davis, Janki, Lazar, Moak, and Nedelman, a total of twelve (12) individuals.

84.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Wheels Up Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

85.     Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

86.     Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Mattson**
**<u>Because of His Principal Professional Occupation as the Company's CEO</u>**

87.     Defendant Mattson has served as the Company's CEO and director since September 2023. The Company does not claim that Defendant Mattson is an independent director and because his primary source of income and primary employment is his employment as CEO of Wheels Up and his professional reputation is inextricably bound to his role at Wheels Up. Defendant Mattson is incapable of acting independently and demand is futile upon him.

### Demand is Futile as to the Members of the Audit Committee

88.     Demand is futile as to Defendant Armstrong, Davis and Moak (the "Audit Committee Members") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

89.     The Board adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties and purpose of the Audit Committee are set forth *supra*.

90.     Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Members were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

91.     The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Audit Committee, the Audit Committee Members were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Members face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Members cannot adequately independently consider a demand.

### Demand is Futile as to Defendant Smith

92.     Demand is excused as to Defendant Smith because he directly benefited from the wrongs and acts complained of herein and face a sufficiently substantial likelihood of liability in connection with his illicit insider stock sales detailed above, which were suspicious in timing and amount, and therefore cannot possibly consider a demand to sue themselves based on those transactions in which he reaped significant benefits

93.     As a result of his access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings during the Relevant Period, Defendant Smith knew the false and misleading statements made through press releases and in the Company's financial statements during the Relevant Period had caused the Company's stock price to become artificially inflated.  While in possession of this material adverse non-public information regarding the Company, Defendant Smith participated in the illegal insider selling set forth herein and thereby received personal financial benefits from the challenged insider trading transactions.

94.     The Company has adopted a policy concerning insider trading in the Code, which states:

> During the course of your relationship with Wheels Up, you may receive or become privy to material, nonpublic information about Wheels Up, or its Business Partners. Material information includes information that could be important for an investor to consider in making a decision about whether to buy or sell securities. Federal, state or local securities law prohibits you from using such material, nonpublic information to purchase, sell, gift or otherwise trade in the Company's securities or provide any such information to others outside of Wheels Up. The penalties for trading on material, nonpublic information can be severe, both for individuals involved in such unlawful conduct and their employers and supervisors, and may include jail terms, criminal fines, civil penalties and civil enforcement injunctions. Our Insider Trading Policy has important information and details regarding these restrictions on trading, including information on related company-wide trading windows and blackout periods.

95.     Accordingly, Defendant Smith has violated the Company's insider trading policies and faces a sufficiently substantial likelihood of liability due to their illicit trades, rendering him incapable of considering a demand.

**Demand is Futile as to the Director Defendants**

96.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

97.     Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

98.     Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

99.     Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

## COUNT I

**Against the Securities Action Defendants for
Contribution Under Section 10(b) of the Exchange Act,
<u>Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act</u>**

100.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.    As a result of the conduct and events alleged above, Wheels Up has been named as a defendant in the Related Securities Action brought on behalf of Wheels Up shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

102.    Federal law provides Wheels Up with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Wheels Up has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Wheels Up to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

103.    Accordingly, Plaintiff, on behalf of Wheels Up, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Wheels Up under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Wheels Up.

104.    Wheels Up claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

105.    Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Wheels Up securities during the Relevant Period.

106.    The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Wheels Up securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

107.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

108.    The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

109.    When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of Wheels Up, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

110.    Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Wheels Up were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution.   Plaintiffs hereby derivatively claim such right of contribution on behalf of Wheels Up.

**Allegations Regarding the Securities Action Defendants as Control Persons**

111.    In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Wheels Up in their roles as directors and/or employees.   Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases, and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

112.    The Securities Action Defendants were "controlling persons" of Wheels Up within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action.   Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

113.    Plaintiff hereby derivatively claims such right of contribution on behalf of Wheels Up.

**COUNT II**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.    The Individual Defendants owed and owe Wheels Up fiduciary obligations. By

reason of their fiduciary relationships, the Individual Defendants owed and owe Wheels Up the highest obligation of good faith, loyalty, and due care.

116.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Wheels Up shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

117.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Wheels Up to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Wheels Up and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

118.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

119.    Plaintiff, on behalf of Wheels Up, has no adequate remedy at law.

## COUNT III

### Against Defendant Smith for Breach
### of Fiduciary Duties for Insider Trading and Misappropriation of Information

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    Defendant Smith, throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be

released to the investing public.  Defendant Smith participated in the scheme to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

122.    This proprietary, non-public information concerning the Company's business and prospects was known by Defendant Smith who sold large quantities of his shares throughout the Relevant Period and was done for his own self-interests, at the expense of Wheels Up and the investing public.

123.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, Defendant Smith breached his fiduciary duties of good faith and loyalty to the Company.

124.    As such, Defendant Smith is legally responsible to the Company for the significant profits he received from the sales of his stock in Wheels Up.

### COUNT IV

### Against the Individual Defendants for Unjust Enrichment

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    By his wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Wheels Up.

127.    The  Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Wheels Up.

128.    Plaintiff, as a shareholder and representative of Wheels Up, seeks restitution from the  Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the  Individual Defendants from their wrongful conduct and

breaches of fiduciary duty.

129.    Plaintiff, on behalf of Wheels Up, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

132.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

133.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

134.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Wheels Up and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Wheels Up the damages sustained by it as a

result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

   C.  Directing  Wheels Up and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect  Wheels Up and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

   (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

   (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

   D.  Determining and awarding to Wheels Up exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

   E.  Awarding Wheels Up restitution from Defendants, and each of them;

   F.  Awarding Wheels Up Contribution from the Securities Action Defendants, and each of them;

   G.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

   H.  Granting such other and further equitable relief as this Court may deem just

and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: December 14, 2023                              Respectfully submitted,

                                                     **BIELLI & KLAUDER, LLC**

                                                     */s/ Ryan M. Ernst*
                                                     Ryan M. Ernst (#4788)
                                                     1204 N. King Street
                                                     Wilmington, DE 19801
                                                     (302) 803-4600
                                                     rernst@bk-legal.com

OF COUNSEL:

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*